FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

98 OCT 28 AM 9:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

JULIAS COLLINS, et al.,

Plaintiffs,

v.

GADSDEN POLICE DEPARTMENT, et al.,

Defendants.

CASE NO:

CV-98-PT-0229-M

ENTERED
OCT 28 1998

MEMORANDUM OPINION

**I. Summary and Background of the Action**

On February 2, 1998, Julius Collins, Lovelace Tolbert, and Walter Holifield ("plaintiffs") filed an action against the Gadsden City Police Department and Gadsden Police Officers Kenneth Pollard, Chase Jenkins, Scott Entrekin, and other unidentified officers of the Gadsden Police Department (for the purposes of this memorandum, the term "defendant" shall refer only to Officer Pollard). Plaintiffs filed the action against the officers in both their individual and official capacities. The plaintiffs' complaint alleges claims of assault and battery, false arrest, excessive force, and civil rights violations pursuant to 42 U.S.C. S 1983. Later, plaintiffs amended their complaint to add the City of Gadsden as a party defendant and to allege that the defendants were negligent and/or wanton in carrying out their duties as police officers. The Gadsden Police Department then filed, on its behalf, a Motion to Dismiss, which was granted by the court. On August 10, 1998, defendant Kenneth Pollard filed the Motion for Summary Judgment now under consideration. Pollard claims that there exist no genuine issues of material fact to be tried and that he is entitled to judgment as a matter of law based on qualified immunity. Plaintiffs, however, claim that there exist a number of disputed factual allegations against Pollard that, when examined in the light most favorable to the them, amount to numerous violations of constitutional and state law provisions and mandate the submission of such allegations to a jury.

Defendant's Motion for Summary Judgment asserts that there exist no genuine issues of material

39

fact remaining for the jury to decide in this case. Plaintiffs dispute Pollard's claim. An overview of both parties' factual allegations is thus warranted.

**II. Plaintiffs' Rendition of the Facts**

On the evening of January 4, 1997, each of the plaintiffs were at the Emma Samson Housing Area. Plaintiffs Tolbert and Collins were visiting their two daughters, Kesha and Kizzy, who lived separately at the Housing Area. They first visited Kesha's apartment. Tolbert then left to visit Kizzy, who lived a few doors down. According to Tolbert, he was walking toward Kizzy's apartment when he observed a fight between two white males and a black male. After Tolbert attempted to halt the fight verbally, one of the white males came up to him and verbally provoked him, causing an altercation between Tolbert and the man.

Following the fight, Tolbert claims to have headed back toward Kesha's apartment, allegedly thinking he had seen Kizzy's car pass by during the altercation. He called for Collins, got into his car, and drove in the direction of the car he thought Kizzy was driving. Tolbert admits that he may have been in a hurry to catch his daughter and may have been speeding. Tolbert apparently pulled into a parking bay in attempting to ascertain whether his daughter was driving the car he was following. At about this time, Collins left Kesha's apartment to find out why Tolbert had called to her. While heading toward Tolbert's location, Collins observed defendant Pollard's truck pulling into the parking bay. Tolbert had left his car and allegedly headed for the car he had been following, only to find it did not belong to his daughter.

Tolbert stated that, upon exiting his vehicle, he heard a man, later identified as Pollard, ask him, "Where in the hell you going like a bat out of hell?" Both Tolbert and Collins have testified that Pollard was not wearing a policeman's uniform at the time and did not identify himself as a police officer at any time during the incident that followed. Plaintiffs Tolbert and Collins claim that, as Tolbert attempted to explain his actions, Pollard became rude and persisted in interrupting Tolbert's attempted explanation. During the attempted explanation, Pollard started talking on a radio he was carrying. As Tolbert made further efforts to explain, Pollard became increasingly abusive and ordered Tolbert to "shut up."

As the situation intensified, a number of people started to arrive at the scene. One of the persons to

witness at least a portion of the incident was Linda Holifield. According to Mrs. Holifield, when she arrived at the scene, Pollard, Tolbert, Collins, Collins' daughter and two of Collins' grandchildren were present. According to the affidavits of Tolbert, Collins, and Mrs. Holifield, shortly after Linda Holifield arrived, Tolbert told Collins that they were going to leave and to get in the car. As they attempted to do so, Pollard prevented Tolbert from entering the vehicle by slamming the door. At that point, uniformed police officers arrived at the scene. Pollard told Tolbert to turn around and face the car. One of the uniformed officers then, allegedly with Pollard's assistance, pushed Tolbert against the car and handcuffed him. Tolbert claims to have never provoked Pollard and notes that, prior to the arrival of the other officers, he had not been given notice that Pollard was a police officer. Tolbert also asserts that he made no effort to resist the arrest and complied with all of the instructions given to him by the officers.

Following the handcuffing of Tolbert, Collins began questioning Pollard as to why Tolbert had been handcuffed. Pollard and Officer Jenkins, one of the officers at the scene, told Collins to get back on the curb. Collins claims to have complied with the order. Collins alleges that, despite her compliance, Pollard and Jenkins intentionally sprayed her in the face with mace. The officers then, according to Mrs. Holifield, also sprayed the crowd with mace. Mrs. Holifield claims that there were three officers, Pollard, Jenkins, and another, present when the mace was sprayed. Tolbert, having watched the officers spray Collins and the crowd, verbally admonished the officers for spraying Collins. The officers reacted, claims Tolbert, by forcing him to the ground and pressing his knee against the concrete. Tolbert claims that the force used by the officers, including Pollard, was excessive and unnecessary and that it was used in a manner that caused pain and injury. Tolbert states that he never struggled or resisted the officers when they took him to the ground and that the sole reason for their doing so was his verbal complaint.

Collins claims to have run to her daughter's apartment immediately after being maced. She returned a short time later, while the altercation was still in progress, and questioned why Tolbert had been forced to the ground. Pollard then used profanity toward her, telling her to, "Shut the fuck up." The police then handcuffed and arrested her. Pollard did not assist in handcuffing Collins.

After the officers sprayed the crowd, Walter Holifield arrived on the scene with the objective of getting his wife, Linda, to leave the fracas. As he came across the street, he was told to step back on the

curb by Jenkins. He complied, and told Jenkins that he was there to get his wife. As he reached to take her back to their apartment, he was handcuffed and arrested without cause. Pollard allegedly assisted with the handcuffing and arrest of Walter Holifield. Walter Holifield claims that Jenkins then pushed him against the car and put his hands around Holifield's throat after having handcuffed him. All of the plaintiffs were then put into police cars and taken to jail. Both Tolbert and Linda Holifield claimed to have smelled alcohol from Pollard's direction during the incident and question whether he was intoxicated.

After the plaintiffs were taken away, Linda Holifield persisted in asking Pollard why her husband had been arrested for nothing and why Pollard had made little or no effort to arrest one of the unidentified white males who was involved in the initial fight. Pollard then called her a "bitch" and allegedly used the word "nigger" repeatedly during the incident. Linda Holifield was not charged with any offenses in connection with the incident and is not a plaintiff. Lovelace Turner and Walter Holifield were, however, charged with Disorderly Conduct and Public Intoxication. Julias Collins was charged with Disorderly Conduct. On February 6, 1997, all charges were dismissed by the Municipal Court of the City of Gadsden.

**III. Facts According to Defendant Pollard**

Pollard describes the incident in a wholly different manner than do the plaintiffs. Although he admits to having used profanity during the incident and acknowledges that his behavior toward persons such as Linda Holifield did not help in resolving the budding conflict, he maintains that Tolbert's uncooperative and elusive behavior sparked the incident and that the crowd's rowdy and uncontrollable behavior caused the situation to escalate. Pollard claims in his affidavit that Tolbert drove down the street at a high rate of speed and that Tolbert nearly ran over him in doing so. According to Pollard, Tolbert then exited the car and had an altercation with a white male. Pollard then approached Tolbert, telling him that he was driving at a dangerous speed for the area and that Tolbert had nearly hit him. Rather than clearly answering his questions, Pollard claims that Tolbert insisted on denying any involvement with anything that was going on. Pollard states that, during this time, the white male ran inside a project house, apparently to avoid possible arrest or confrontation with the police. Also during this time, Pollard called for backup on the radio he was carrying.

The situation escalated, and the backup officers arrived. Because of the volatile nature of the crowd's behavior, one of the officers found it necessary to use pepper spray. Pollard claims never to have possessed or used pepper spray during the altercation. Although Pollard's affidavit is not clear on when the plaintiffs were arrested, the arrests apparently took place at about this point in the story. Pollard contends that he never arrested, attempted to arrest, or handcuffed any of the plaintiffs. Both of these claims are contested by the plaintiffs.

Pollard contends that, following the use of the pepper spray by the other officer, he (Pollard) went to the door of the apartment that the white male entered when he fled the scene. The white male did not come out, and members of the crowd, according to Pollard, became very belligerent and vocal in decrying his lack of effort to apprehend the white suspect as opposed to the vigor he had used in approaching Tolbert, a black man. In an effort to control the crowd, Pollard used profanity in demanding that the primary boisterous member, Linda Holifield, calm down and "let him do his job." Pollard claims that his command, although possibly inappropriate, was effective in stemming the tide of the crowd's increasing aggression and that the boisterous woman thereafter quieted herself and apologized for her behavior. Mrs. Holifield admitted that, at the scene of the confrontation, she expressed "outrage" because a black man was arrested, while Pollard was ". . . going to let this white man go back into that project, close the door and act like he's not there." Pollard also states that he did not drink any alcohol prior to the incident.

**IV. Pollard's Claim of Qualified Immunity**

Pollard claims that he is entitled to qualified immunity for the claims made by plaintiffs.[1] He cites Ensley v. Soper, 142 F.3d 1402 (11th Cir. 1998), as authority. In Ensley, the 11th Circuit stated:

> The doctrine of qualified immunity "protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir.1994) (en banc ) (internal quotation marks omitted). Any case law that a plaintiff relies upon to show that a government official has violated

---

[1] Note that the defendant has only claimed and argued qualified immunity for the federal claims, as outlined in Ensley. The defendant has not, in his motion for summary judgment or in his accompanying brief, suggested that Pollard is entitled to discretionary immunity for the claims made by the plaintiffs under Alabama state law provisions.

> a clearly established right must pre-date the officer's alleged improper conduct, involve materially similar facts, and "truly compel" the conclusion that the plaintiff had a right under federal law. See id. at 1150. Moreover, "[o]bjective legal reasonableness is the touchstone"; a court must examine whether a government officer has acted in an objectively reasonable fashion under the circumstances, without any consideration of the government actor's subjective intent. Id.

142 F.3d at 1406.[2]

Pollard claims that he reacted to a potentially dangerous and obviously volatile situation and that the practice of using abrupt verbal commands to gain control of such a situation is a well-accepted practice in the police community. His actions were thus, according to Pollard, discretionary in nature and within the bounds of reason. According to Pollard, Linda Holifield's admission that she acted with outrage and in a boisterous manner justifies his behavior during the conflict. Pollard claims that there is no evidence to support the conclusion that he violated any clearly established constitutional or statutory rights. Pollard does not, however, make any mention in his supporting brief of the plaintiffs' false arrest, illegal detention, or excessive force claims and allegations, and has elected not to submit a reply to the plaintiffs' response.

**V. Plaintiffs' Claims**

---

[2] In Madiwale v. Savaiko, 117 F.3d 1321 (11th Cir. 1997), the court, in determining whether a defendant was entitled to qualified immunity, stated:

> The applicable law provides that government agents engaged in discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The fundamental inquiry in a qualified immunity case is whether "a reasonable official would understand that what he is doing violates [a federal constitutional or statutory] right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). However, "this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. at 640, 107 S.Ct. at 3039 (citations omitted). As the Supreme Court recently emphasized, "general statements of the law are not inherently incapable of giving fair and clear warning, and ... a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question...." United States v. Lanier, --- U.S. ----, ----, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997). [FN1] The qualified immunity inquiry, then, must establish first, whether the defendant government official was performing a discretionary function and, second, whether, in doing so, the defendant should reasonably have known that the action violated an individual's clearly established federal statutory or constitutional rights.

117 F.3d at 1324.

Plaintiffs claim that their rendition of the facts clearly alleges violations under 42 U.S.C. 1983, the Fourth Amendment of the United States Constitution, and several state law provisions, and that Pollard is not immune from any of the claims. Plaintiffs point out that there exist a substantial number of inconsistencies between their description of the incident and that of Pollard, and claim that the differences in their stories illustrates the difference between a police officer doing his duty and a police officer unconstitutionally violating the rights of citizens. Thus, state the plaintiffs, there exists a genuine disagreement as to the material facts concerning the incident.[3] Pollard's actions on the evening of January 4, 1997, according to the plaintiffs, constituted false arrest and illegal detention and violated their Fourth Amendment right not to have excessive force used against them in an arrest.

**A. Arrest Without Probable Cause**

Plaintiffs allege that all of the arrests were affected without provocation or probable cause. In order to succeed in an action for false arrest and/or illegal detention based on lack of probable cause, a plaintiff must allege misconduct that exceeds mere negligence. There is no question, however, that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment. Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir.1990); Herren v. Bowyer, 850 F.2d 1543 (11th Cir.1988). Plaintiffs state that Pollard's reliance on Ensley v. Soper, *supra,* and related cases is misplace in that a violation of the Fourth Amendment gives rise to a private cause of action under S 1983 according to

---

[3] In Sheth v. Webster, 137 F.3d 1447 (11th Cir. 1998), an arrestee brought an action against an arresting officer and police sergeant, asserting, among other claims, state law claims for assault and battery and false arrest, and federal law claims for use of excessive force and unlawful search and seizure. The court, in ruling on the qualified immunity issue, stated that a qualified immunity ruling is a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case. Id. at 1451. When examining a qualified immunity claim within a summary judgment motion, all issues of material fact are resolved in favor of the plaintiff. The court then answers the legal question of whether the defendants are entitled to qualified immunity under that version of the facts. Id. The plaintiff in Sheth claimed that, in addition to arresting her without probable cause, the officer pushed her against a soda machine, handcuffed her, and dragged her to the police car. The court denied qualified immunity to the officer both on the false arrest claim and on the excessive force claim, stating that there existed no evidence to suggest that she posed any danger to the officer or others and that the Fourth Amendment reasonableness standard would inevitably lead every reasonable officer to conclude that the use of force was unlawful. Id.

Gilmere v. City of Atlanta, 774 F.2d 1495, 1501 (11th Cir. 1985).[4] The Fourth Amendment of the United States Constitution provides, in part, that "the right of the people to be secure in their persons . . . against unreasonable searches and seizure shall not be violated." Id., 774 F.2d at 1501. The Gilmere court, quoting an earlier Supreme Court holding, stated that "whenever an officer restrains the freedom of a person to walk away, he has seized that person." Id., 774 F.2d at 1502; See also, Tennessee v. Garner, 105 S.Ct. 1694, 1699 (1985). To circumvent the violation of a person's right to be free from such seizures requires, according to plaintiffs, proof of "arguable probable cause." See Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997). The 11th Circuit examined qualified immunity in the context of Fourth Amendment lack of probable cause claims in Evans v. Hightower, 117 F.3d 1318 (11th Cir.). The Evans

---

[4] The Gilmere court's full analysis of the Fourth Amendment seizure issue developed as follows:

> The plaintiff also asserted a claim against both police officers under the fourth amendment, which provides in relevant part that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures shall not be violated." As the Supreme Court recognized in Monroe, a violation of the fourth amendment gives rise to a private cause of action under S 1983. See also Wolf-Lillie v. Sonquist, 699 F.2d 864, 871 n. 13 (7th Cir.1983); Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir. Unit A 1981); Jenkins v. Averett, 424 F.2d 1228, 1232 (4th 1502 Cir.1970). The existence of state tort remedies is no bar to the direct assertion of such a claim in federal court. As noted in Monroe, "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. at 183, 81 S.Ct. at 482. The Court in Parratt took pains to avoid disturbing this aspect of Monroe, acknowledging that S 1983 claims involving a violation of an enumerated constitutional right were substantively different from those based solely on fourteenth amendment due process. Parratt, 451 U.S. at 536, 101 S.Ct. at 1913. See also Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 3210 n. 9, 82 L.Ed.2d 393 (1984) (Stevens, J., concurring in part and dissenting in part). The sole issue before us in evaluating this claim, therefore, is whether the plaintiff made out the elements of an unreasonable seizure.
>
> As the Court recently noted, "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." Tennessee v. Garner, 471 U.S. ----, ----, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). . . . A seizure is not unconstitutional, however, unless it is "unreasonable." Reasonableness is to be determined by " 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Id. at ----, 105 S.Ct. at 1699 (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). In conducting this balancing test, we are to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

774 F.2d at 1501-1502.

court stated that:

> [P]robable cause exists if "the facts and the circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." United States v. Jimenez, 780 F.2d 975, 978 (11th Cir. 1986). However, when considering qualified immunity, the issue is not probable cause in fact, but arguable probable cause. Actual probable cause is not necessary for an arrest to be objectively reasonable. Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable. Von Stein, 904 F.2d at 579. Thus, in applying the qualified immunity test in the context of a claim of an unlawful arrest, "we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff...." Id.

117 F.3d at 1321. Thus, an officer is entitled to qualified immunity where the officer had "arguable probable cause." Thornton v. City of Macon, 132 F.3d 1395, 1399 (11th Cir. 1998) (quoting Von Stein, 904 F.2d at 579).

Qualified immunity does not shield government officials performing discretionary functions from civil liability if their conduct violates clearly established constitutional rights of which a reasonable person would have known. See Post v. City of Fort Lauderdale, 7 F.3d 1552 (11th Cir. 1993). To overcome a claim of qualified immunity, a plaintiff must show that when the official acted, the law was developed in such concrete and factually defined context as to make it obvious to all reasonable government actors that what he is doing violated federal law. See McMillan v. Johnson, 88 F.3d 1554, 1565 (11th Cir. 1996), opinion amended on rehearing, 101 F.3d 1363 (11th Cir. 1996). Plaintiffs thus contend that Pollard's claim does not leave them remediless, but merely narrows the issues. Whether a defendant may utilize immunity, according to plaintiffs' reading of McMillan, depends on whether: 1) the defendant had sufficient probable cause to stop, detain, and arrest plaintiffs; and 2) if probable cause was lacking, whether, on that day, to stop, detain, and arrest plaintiffs without it violated clearly established law. See McMillan, 88 F.3d 1565.

The law as to probable cause was, state the plaintiffs, firmly established on January 4, 1997. The plaintiffs maintain that, under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), and the cases stemming from Terry, that Pollard was not justified in arresting Lovelace Tolbert for Disorderly Conduct and Public

Intoxication.[5] Tolbert claims that he did not provoke Pollard, that Pollard persisted in treating him in a rude and unprofessional manner, and that Pollard refused to let him leave. Pollard never identified himself as a police officer and thus provided no reason for Tolbert to obey his commands. According to plaintiffs, although a reasonable person may have cited Tolbert for a traffic violation, a reasonable person would not have arrested Tolbert for Disorderly Conduct or Public Intoxication. Tolbert complied with the officers' instructions and made no effort to resist the arrest. He claims to have only consumed one beer and perhaps part of another at his daughter's apartment prior to the incident. The plaintiffs thus contend that, given the circumstances of the arrest, Pollard clearly violated Tolbert's constitutional rights.

Plaintiffs also allege that Pollard took part in the unconstitutional detainment and arrest of Walter Holifield and Julias Collins. Pollard, according to plaintiffs, assisted in the handcuffing and arrest of Walter Holifield without just cause. Walter Holifield, as stated above, was charged with Disorderly Conduct and Public Intoxication. However, he claims to have complied with the officers' instructions and that he did nothing to incite the officers or the crowd. His presence at the scene was, according to plaintiffs, not enough to justify his arrest or the treatment that followed. Further, he claims to have not had a drink during the entire day prior to the incident. The arrest was thus affected, according to plaintiffs,

---

[5] The Alabama Code outlines Disorderly Conduct as follows:

13A-11-7 Disorderly conduct.

(a) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1) Engages in fighting or in violent tumultuous or threatening behavior; or

(2) Makes unreasonable noise; or

(3) In a public place uses abusive or obscene language or makes an obscene gesture; or

(4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or

(5) Obstructs vehicular or pedestrian traffic, or a transportation facility; or

(6) Congregates with other person in a public place and refuses to comply with a lawful order of the police to disperse.

Ala.Code S 13A-11-7 (1994).

Section 13A-11-10 of the Alabama Code defines Public Intoxication:

13A-11-10. Public intoxication.

(a) A person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity.

Ala Code S 13A-11-10 (1994).

without probable cause on either the Disorderly Conduct or Public Intoxication counts. Although Pollard did not assist in the handcuffing and arrest of Julias Collins, plaintiffs claim that it was his actions against Tolbert that led to her complaints and thus caused her to be arrested without probable cause.

**B. Excessive Force**

The 11th Circuit has recognized that the caselaw concerning excessive force claims has not established a clear standard by which to judge all excessive force allegations. In Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), the court explained that:

> A reasonable officer's awareness of the existence of an abstract right, such as a right to be free of excessive force, does not equate to knowledge that his conduct infringes the right. Thus, "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive. Therefore, unless a controlling and factually similar case declares the official's conduct unconstitutional, an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw. (Citations omitted)

127 F.3d 1419. In order for plaintiffs to maintain their claim, Pollard's alleged conduct must, therefore, closely resemble conduct previously proscribed within caselaw or clearly and unmistakably violate the very essence of Fourth Amendment principles.

According to plaintiffs, Pollard's use of force clearly crossed the line between a reasonable reaction to a tense situation and abuse of power. Pollard allegedly utilized excessive force against each of the plaintiffs at some point during the incident or was present during the use of such force. Pollard allegedly pushed Tolbert to the ground and unnecessarily pushed his knee into the concrete, sprayed Collins with mace, and assisted in the arrest of Walter Holifield, who was subsequently choked by Officer Jenkins in the presence of Pollard.[6] Thus, conclude the plaintiffs, because the arrests lacked probable cause and

---

[6] See Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. 1993)(A police officer has a duty to intervene when another officer uses excessive force); Ting v. United States, 927 F.2d 1504, 1511 (9th Cir.1991)(In a Bivens suit, the courts will apply general principles of S 1983 law regarding law enforcement officers' duty to intervene to prevent injuries to a citizen from other law enforcement officer); Gaudreault v. Mun. of Salem, Mass., 923 F.2d 203, 207 n. 3 (1st Cir.)(An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under S 1983 for his non-feasance), cert. denied, 500 U.S. 956, 111 S.Ct. 2266, 114

because the officers, including Pollard, utilized excessive force to affect the arrests, Pollard is not entitled to qualified immunity.

**VI. Court's Conclusion**

Prior to the Supreme Court's decision in Graham v. Conner, 490 U.S. 386, 393 (1989), the circuit courts generally construed excessive force claims as covered by substantive due process. Under the substantive due process formulation of excessive force, in determining the existence of excessive force, "a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent and injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973), cert. denied, 414 U.S. 1033 (1974). In Graham, however, the Court determined that the substantive due process standard was not applicable in all instances of excessive force. In assessing whether an application of force against a suspect is reasonable, the Court delineated the issues courts should address in examining excessive force claims:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of ""the nature and quality of the intrusion on the individual's Fourth Amendment interests"" against the countervailing governmental interests at stake. [Tennessee v. Garner, 471 U.S.] at 8 [], quoting United States v. Place, 462 U.S. 696, 703 [] (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S., at 22-27 []. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 [] (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S., at 8-9 [] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").
>
> The "reasonableness" of a particular use of force must be judged from the

---

L.Ed.2d 718 (1991); O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988)(A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers); Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir.1985) (It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under S 1983, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his non-feasance).

> perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S., at 20-22 []. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, Hill v. California, 401 U.S. 797 [] (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, Maryland v. Garrison, 480 U.S. 79 [] (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139 [](1978); see also Terry v. Ohio, supra, 392 U.S., at 21 [] (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing United States v. Robinson, 414 U.S. 218 [] (1973).

Graham v. Conner, 490 U.S. at 396-97. "Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." Id. at 399.

In the aftermath of Graham, the 11th Circuit has developed a different approach to excessive force claims. The approach now taken is fact sensitive, examining whether any of the force used was necessary to effect the arrest and, of the force that was not, whether it was reasonable in light of the factors announced in Graham, i.e., "the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing." Post v. Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993). Under Alabama law, "[a] peace officer is justified in using that degree of physical force which he reasonably believes to be necessary . . . unless the peace officer knows that the arrest is unauthorized. . . ." Ala. Code § 13A-3-37(a)(1). Courts should undertake this analysis in the light that the reasonable officer would have viewed the circumstances with which the actual officer was presented. See id.

Three recent cases by the 11th Circuit have impliedly, if not explicitly, utilized a de minimis force rule in resolving excessive force claims. In Post v. Fort Lauderdale, 7 F.3d 1552, during an arrest of the plaintiff for an ostensible violation of the City's building code, an officer placed the plaintiff into a choke

hold, handcuffed him and pushed him against a wall. The court found, citing Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986), for the law that was clearly established at the time of the alleged constitutional violation, that the force used by the officer was not unreasonable because the amount of force used was minimal. In Gold v. City of Miami, 121 F.3d at 1446, the police left handcuffs on the plaintiff too tightly for an extended period of time. Citing Post, the court determined that qualified immunity barred the claim excessive force, because "the minor nature of this injury reflect[ed] that minimal force was used to apply the handcuffs." Id. Finally, in Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997), the police "'slammed' [the plaintiff] against [a] wall, kicked his legs apart, required him to raise his hands above his head, and pulled his wallet from his pants." The court found, again citing Post, that the force and injury used were minor in nature, permitting a finding that qualified immunity barred the damages claim. Id.

The de minimis standard would be the incontrovertible law of the 11th Circuit, United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir. 1993), were it not that prior to Post and after Graham, the 11th Circuit had already set forth a standard to be followed in post-Graham excessive force cases that did not employ the de minimis rule. In Ortega v. Schramm, 922 F.2d at 695-96, a sheriff and his deputy entered into a gas station where the plaintiffs were, blowing off the door lock with a shotgun. While they searched the station, the plaintiffs were held at bay at gunpoint. Afterwards, they were taken out to the station parking lot at gunpoint, while one plaintiff, Ortega was dragged outside. Two other plaintiffs requested medical assistance for Ortega. The police placed all three in handcuffs. The court determined, without reference to whether the force was minimal or not (and, in light of the subsequent cases, it was clearly minimal), that the force used against all of the plaintiffs was unreasonable, with reference only to the factors set forth in Graham. See id.

In Thornton, the 11th Circuit held that police officers were not entitled to qualified immunity for using excessive force in effectuating an arrest. The officers in Thornton grabbed one of the plaintiffs, threw him to the floor, handcuffed him, and dragged him to the police car. The police officer also slammed a second plaintiff against the hood of the police car and handcuffed him. The court held that the officers were not entitled to qualified immunity because "the officers were not justified in using any force, and a reasonable officer thus would have recognized that the force used was excessive." Id. at 1400. Although the court did not explicitly use the phrase "de minimis" in denying the officers qualified immunity, its

implicit holding was that the officers had exceeded the de minimis level of force by throwing Thornton to the ground, handcuffing him, and dragging him to the police car.

The court concludes that there are issues of fact which preclude summary judgment in this case. Although it is not clearly established that mere harsh language by a police officer is sufficient to violate any constitutional right, there is evidence here of conduct which may evidence such violations. Viewing the evidence from the plaintiff's perspective, Pollard may have made unlawful arrest(s) and may have used excessive force. If plaintiffs' versions are correct, Pollard should have known that his actions were unlawful. The court cannot resolve disputed factual issues as a matter of law. Pollard's motion will be Denied.

This 28th day of October, 1998.

ROBERT B. PROPST
UNITED STATES DISTRICT JUDGE